Thank you. We'll turn to the third argument, and that is United States v. Scott, case number 23-2234. Good morning, Your Honors, and may it please the Court. Kate Morris of the Federal Public Defender's Office, on behalf of Foster Lee Scott, I'd like to reserve three minutes of my time for rebuttal, and I'll keep an eye on the clock. Mr. Scott was convicted of drug trafficking after two law enforcement officers testified that he had the mens rea required for that offense. That was the only issue in dispute at his trial. I'd like to start by addressing the expert testimony from Sergeant Helms, who testified that it was absolutely not possible that someone in Scott's shoes would possess the drugs for personal use, and that the only reason someone in Barstow would possess over 280 grams of meth is for the sole purpose of sales. That testimony is plain error under the Supreme Court's decision in Diaz. Diaz held that while an expert can testify that most people in the defendant's shoes have the requisite mens rea, an expert violates Rule 704B if they testify that all people in the defendant's shoes have that mens rea, even if the expert doesn't use the defendant's name. Because by assigning a mens rea to a class of people that includes the defendant, the expert is necessarily giving an opinion about the defendant's mens rea. That's exactly what Sergeant Helms did in this case. Although Helms started out by giving modus operandi testimony about typical practices of drug dealers and drug users in Barstow, he went beyond the scope of that permissible testimony when he testified that all people who have this quantity of methamphetamine in Barstow would possess it with the intent to distribute. That's just like the example that the court gave in Diaz of an expert who testifies at an arson trial that all people in the defendant's shoes set fires maliciously, and that's why it's plain error. When I read Helms' testimony, he makes sort of fairly broad categorical statements about why a person would have this quantity of methamphetamine, but I had not noticed that he was really asked to distinguish between most people or all people. Where would you point me to as showing that he said all people have this intent? Your Honor, there are four parts of Helms' testimony that we're contesting. Specifically, number one is when he testifies at pages 423 to 424 of the record that in Barstow, 300 grams of meth is absolutely not for personal use. Number two is at ER 418 to 419. That's when he testifies that the only reason someone in Barstow would possess over 280 grams of meth is for the sole purpose of sales. Number three is the mirroring hypothetical. That's at ER 422 to 423. He's asked by the prosecutor in Barstow if a person had 300 grams of meth inside a large Ziploc bag divided equally into five Ziploc bags and over $2,000 in cash. What would your opinion be as to that person's intent? Yeah, okay. And then number four is ER 421 to 422. That's where he's shown the government's photos depicting the evidence in this case, and he gives his opinion that the drugs in this case were possessed for the sole purpose of sales. So it's opposition. That's him saying... I mean, so just to take that last one, right? In hearing that and seeing the six baggies, what is that indicative? I think there should have been an of. What is that indicative to you, he says, of possessing for the sole purpose of sales? So I don't... I'm not sure that saying this is indicative of possession for the purpose of sales is quite the same as saying that all persons who had drugs under these circumstances would have the mens rea required by the statute. I mean, I agree the gap is fairly small, but Diaz was willing to tolerate a fairly small gap between the kind of expert testimony that it said was impermissible and the kind that it said was okay. So what's your response to that? Well, on that fourth piece of testimony, I think the problem is the use of the phrase sole purpose of sales. I think that's pretty unequivocal and categorical as the mens rea that a person with the evidence in this case would necessarily have. But I agree that that fourth piece of testimony, the reason I listed it fourth, is because I don't think it's quite as clear as the first three pieces of testimony that I identified. I think the mirroring hypothetical in particular, that's clearly plain error under Diaz, and in fact mirroring... But that one, I mean, that was on 423, right? He's given the hypothetical, what would your opinion be? He or she is a drug dealer and they're possessing that amount for the purpose of sales. I mean, when you're asking what would your opinion be, he's stating what his opinion would be. It's not accompanied by a probability, and so in an ordinary sense, my opinion is X. That doesn't mean my opinion is X with 100% certainty, which is what Diaz prescribes, right? So isn't there again a small, I mean, it's a subtle distinction, but Diaz was willing to tolerate really subtle distinctions, wasn't it? Your Honor, I disagree with that. Rule 704B is called opinion on an ultimate issue. The Supreme Court was clear in Diaz that an expert giving an opinion on the ultimate issue, that's what's covered by that rule. So I don't think just by an expert saying, well, in my opinion, that person is a drug dealer and they would absolutely not possess the drugs for the purpose of personal use. Just saying that's my opinion doesn't take you outside of 704B. The whole point of 704B is to cover expert opinions on an ultimate issue. So I think that would allow the government to circumvent 704B if all an expert has to do is say, in my opinion, the drugs in this case were used for the purpose of personal use. Can you address the issue of harmlessness? Because let's assume we agree with you that the prosecutor's argument is more improper and the district court erred by failing to give a curative instruction. Doesn't the other evidence suggest that Scott was lying or at least making inconsistent statements about his meth use such that the error would be harmless? I'm sorry, Your Honor's question is about the misconduct claim? Well, the evidence doesn't suggest that he was lying about his meth use. We transmitted the exhibit to the court where he, this is the 2021 video, where he, according to the government, says that he uses a sixteenth of a gram. If the court listens to the audio of that video, he doesn't say he uses a sixteenth of a gram. That's not, I would just ask the court to listen to that because he doesn't say the word sixteenth of a gram. What happens in that video is that Sergeant Hollister is asking him how much he uses. My client gives a very confused response and ultimately Hollister gets him to say that he uses a couple of little nuggets at a time, but he doesn't say he uses a sixteenth of a gram. So there wasn't evidence that he was lying about that. He's clear in direct that he uses several sixteenths or teners per day, and then Sergeant Helms, the expert, testifies that a tener is a sixteenth of an ounce. So it's actually pretty clear that my client was saying he uses several sixteenths of an ounce per day. In terms of the harm of the misconduct, I have a couple of points on that. The first point is that the misconduct went to the heart of the personal use defense because obviously it's much less plausible, that defense is much less plausible if the jury thinks that my client was using a sixteenth of a gram every day because that would have made his stash last about three and a half years. Whereas if they believe it's a sixteenth of an ounce, it would have only lasted him about a month and a half to three months. So that's a far more plausible explanation for the quantity. I'd also add two more points, which is that this court has recognized that a federal prosecutor's remarks carry a lot of weight with the jury. And then third, that these comments were made on rebuttal, so there was no opportunity for the defense to rebut them and point out what I just pointed out to your Honor about the fact that in the video he doesn't say it's a sixteenth of a gram because it was on rebuttal. The defense didn't have an opportunity to clarify that. But you did object to the statement, right? And the district court sustained the objection. So I guess the argument has to be that it was plainly erroneous for the district court to not sua sponte what exactly? Give an instruction to disregard the statement? Yes, Your Honor. Well, on the standard of review, our position is that because this is a constitutional violation, the government's so it's not our position is this isn't plain error. It's a constitutional violation. And so the burden is actually on the government to prove harmlessness beyond a reasonable doubt. But in terms of what we think the court should have done, yes, we think the court should have stricken the comment and given an instruction that is sufficiently responsive and specific to cure the harm along the lines of that was an improper line of argument. A defendant has every right to consult with and prepare with a counsel, and you're instructed not to draw any adverse inference from that consultation in preparation. Because the court did give the standard instruction that the statements of the lawyers during argument are not evidence, right? Yes, yes, it did. But the court also gave in its preliminary instructions the instruction, and this is a E.R. 68. It told the jury that even though closings are not evidence, they are very important when it comes to how you weigh the evidence. So and what is I mean, so I take the point where you about the standard review, but assuming that I think the plain error standard does apply, what's the best case for the proposition that it is a plain or obvious error, having sustained an objection, not to go on to sort of sua sponte, give a lengthy, lengthy instruction to the jury, which you might think would only sort of highlight the comment in the minds of the jurors. But what what what case says that the court is supposed to do that? Well, I'll answer that in two parts. The first part is that all the court did here was say sustained. A jury, that's legally is a jury isn't necessarily going to understand what the court has done there. Often in general instructions to the jury, the court will actually say to the jury, I'm going to make a series of rulings throughout trial. You're not to draw any inferences from my rulings. So the idea that by saying that defense counsel pops up and says objection and the district court says sustained, that that cures the prejudice of the misconduct. I just don't think a jury would understand what sustained means. In terms of what case is the best case, I would say we cited Nobari, which is a Ninth Circuit case from 2009, and Simtob, which is a 1990 Ninth Circuit case. And they both stand for the position that once the court recognizes that there's a misconduct problem, it has an affirmative duty to remedy the misconduct with an adequate curative instruction. You want to reserve? Yes, please. Thank you. Good morning, Your Honors. May it please the court. David Williams for the government. Earlier this morning, Judge Nelson suggested that with thorny questions, sometimes the most straightforward option is to just say that things are harmless and to say you don't need to address every nuance because it's harmless. And this is, I don't know that I would say that questions are thorny, but it is an easy case for harmlessness. This is a case where the defendant had almost a pound of methamphetamine. It was not barely 50 grams. It was not sort of on the margins between personal use and dealing quantities. It was almost a pound of methamphetamine in six separately packaged baggies. He had over $2,000 cash in small bills in his hands when the officers found him. May I address the, I think your friend on the other side listed four instances in which his testimony violated the 704B rule set forth in Diaz. And I'm particularly interested in the one at pages 422 and 423, where the statement that 300 grams of methamphetamine would, quote, absolutely not be for personal use. Doesn't that sound like an unequivocal statement that all defendants have a particular mens rea? I don't think so. I think that when you read it in context, it's talking about his belief of what he would infer, but it's not saying that he would say every single defendant would do it. It's that if he saw this, he would definitely think that it was. That doesn't mean that nobody, that doesn't mean that there aren't other exceptions to the rule. Absolutely not sounds pretty unequivocal to me, and I am reading it in context. I'm reading all of the lines and the pages around this testimony. I agree. Absolutely not is not equivocal as to his belief. But I think what the absolutely not refers to can be read to talk about his belief as opposed to how many people, the whole universe. Is he saying absolutely most people would do it, or is he saying absolutely every single person would do it? And when you look through the testimony, he never says that his description of who sells drugs is universal. He never uses the words all. He never uses the words every. He never talks about each drug dealer. What he talks about is that each case is independent and different, needs to be evaluated under the totality of the circumstances. He uses that phrase repeatedly, and he talks about the different things that you would look at. And so what he's saying, I think in this context, when he's saying it is he would absolutely not believe it because as a general rule, that's not how it works. But that doesn't mean that every single person is doing that. But again, I think much easier way to deal with this is simply to say it's harmless for a variety of reasons. The $2,000 in cash, almost a pound of methamphetamine, the fact that he had no way to have obtained that much methamphetamine. His story was that he stole money from his girlfriend. His girlfriend was a waitress whose monthly rent was $500. Him saying that $2,000 in cash stuffed under the mattress was hers, I think is facially implausible under the circumstances of this case. He talks about how he got a very great deal, and his whole story is he got a great deal on this purchase of meth for personal use that comes out to $100 over the course of three months. Already implausible on its face. Also implausible even accepting the defendant's calculation of the maximum that he ever actually claimed to use was five grams a day. That is a more than two month supply of meth. And that is, it's just not an amount of meth that any one person could use without distributing it. I mean, there is no evidence whatsoever to suggest that any meth user is personally holding and parceling out five grams per day every day for three months without using significantly more or significantly less on some days. I think his entire testimony was simply implausible under the circumstances of this case. So I think that in context, the absolutely not refers to the officer's beliefs as opposed to the universe of people who do it. But the easier way to deal with it is harmlessness, for sure. And to be clear, when you're saying you're saying harmlessness, but it's really, this is on plain error, so it's it's prong three or prong three and prong four. It's not just prong three, it is also prong four, that it's not just prong three is their prejudice. It's a violation of substantial rights and integrity and fairness to the judicial process that under the circumstances of this case, amongst many things, I don't think anyone is surprised that an expert opinion would be that using that having a pound of meth is consistent with drug sales. I don't think this is outside the scope of public reputation of judicial proceedings. I think that this happens, this or things very, very, very close to it happen frequently in almost every single drug case. And saying that this is so detrimental that it seriously affects the public reputation of judicial proceedings, I think stretches plain error much further than it can go. I am happy to talk about any other particular questions the court has, but I would move to Diaz quickly because I think it was something that we didn't get the full briefing on. Diaz is expressly consistent with the circuit's precedent on what the proper subject of expert testimony can be. And in doing so, I think when you look at the expert testimony here, you compare it with this court's prior cases, Younger, Gonzalez. I don't think that you can say that Diaz is- And Diaz didn't change the standard for- No. No, it didn't change the standard in this circuit. And so to the extent that it talks about this issue, it doesn't talk about hypotheticals. So it has nothing whatsoever to say about hypotheticals. That question about the mirroring hypothetical, Diaz can't change the standard because it didn't talk about it. This circuit's precedent on mirroring hypotheticals is almost exactly the same as this case. And so to the extent that there might be some wiggle room and some play between Diaz and this circuit's precedent, which I don't think that there is, even if there is, we come back to the harmlessness question. This is a bad case for- This is a bad vehicle for addressing that because you have so much meth and so much cash that there's just- Even if you reach that issue, I don't think that you come out reversing the case because you still have to come up with the third and fourth prongs of harmless error. Can you address the statement in closing argument? One oddity here, of course, is that the objection came kind of in the middle of the statement and we don't really know what the second half of the sentence was going to be. But it kind of sounds like it was leading up to some insinuation that defense counsel had planned with the defendant for the defendant to lie. What are we to make of that? I think- I don't think that it was a plan to lie. I think that it was- Where it was going was- I described this in the briefing, that this is in the middle of a, I think, five or six page discussion of four separate problems with defendant's story of the case. One of the problems was that on direct, he testified one way and on cross, he acknowledged that he said, I think, it was a sixteenth of a gram. A gram, it is what it is. He says that and so his testimony did change on cross as to that point. And I think what the prosecutor was saying was his pre-planned testimony went well because he knew what he was going to say. And on cross, he got flustered and changed his story. I don't think that it was saying that defense counsel had anything illicit in mind. I think it was the sort of ordinary slip of the tongue that can happen in a courtroom when you're looking at people across the table. You see two people next to you and you talk about them both as opposed to malicious intent. I certainly don't think there's any showing of that. And I think that it was talking about the defendant's changing story is what it was talking about. And when he picks up, when the prosecutor picks up after the objection, that's the sentence that he completes, is that the defendant's story changed and that the defendant's story made no sense. And in context, I think that's where that was going and the reference to defense counsel was a slip of a tongue, which an objection is a perfectly appropriate way to address and did thoroughly address. And I think the court's question earlier to my colleague about whether the district court should have sua sponte issued a curative, the curative that she gave as a possibility, I think it goes much too far. What she's contemplating would be that any time an objection is sustained, the court should always give a curative, instructing the jury as to why there was a problem with the evidence. And that's not the case. I think that when you instruct the jury as to why there might be a problem with evidence or a problem with a statement, you do call attention to what the problem was. And rightly or wrongly, it can plant seeds in jury's minds that the court wouldn't want to do. And if the court's going to do that, it should at least come at the request of a defense attorney. Defense counsel could have done that here, didn't do that, I think, was satisfied with the way the statement was reframed. I think that's the logical inference from the way this closing statement went forward after that. She also mentioned briefly that this came up on rebuttal and that defense counsel didn't have a chance to address the issue of whether it was a 16th of a gram or a 16th of an ounce. Whether it was a 16th of a gram or a 16th of an ounce was a huge issue throughout the entire rest of the trial. It's not like this was the first surprise time it came up. There was extended cross-examination over the question. This wasn't a surprise gotcha in rebuttal. This was part of the case, which I think also diminishes any prejudice that this wasn't a surprise moment that the jury had never even thought about. This was what they had been hearing throughout the rest of the case. Does the court have any further questions? I don't think so. I appreciate your arguments. My colleague on the other side said that Diaz had nothing to say about mirroring hypotheticals along the lines of the one that was used in this case. I disagree with that. For one thing, it came up at oral argument in Diaz. Justice Kagan asked a question of the assistant to the solicitor general about it. The government acknowledged that mirroring hypotheticals along the lines of the one that Justice Kagan posed in her question are just a transparent way to circumvent the requirements of 704B. They're taking an inconsistent position with that in this case. I would also say that the problem isn't the mirroring hypothetical question. It's the answer. So a prosecutor is allowed to ask an expert witness a hypothetical that closely tracks the facts of the case, but the expert can't give an unequivocal answer about the mens rea that a person in that situation would have under Diaz. Diaz makes very clear that you can't use a hypothetical question to create a class of people that necessarily includes the defendant and then give an opinion about the mens rea of a person in that class. So I think Diaz does functionally say something about the use of mirroring hypotheticals. Going on to prong three of plain error. I just want to come back to the standard for prejudice under plain error. This came up earlier today. And the standard for prong three is a reasonable probability of a different outcome. That certainly doesn't require us to prove an acquittal absent the errors. It doesn't even require us to prove a reasonable probability of a different outcome by a preponderance. It's less than 51%. And applying that standard to, in particular, Helms' testimony, what you have is an expert put on by the United States to talk about drug trafficking who testifies in a single issue trial, mens rea was the only issue, that in his expert opinion, it was absolutely not possible that my client possessed the drugs for personal use. So what he's saying is basically in his expert opinion, he believes my client is guilty. This court has recognized that expert opinions carry special weight with juries. That's particularly the case with Sergeant Helms, who was presented as highly credentialed and experienced. He told the jury he'd been on the force for over a decade. He'd worked over 300 drug investigations. He said he was in a supervisory role. He was a watch commander and advised other officers as to whether their drugs cases were more likely personal use or sales. And the government relied extensively on his testimony. They previewed it in opening and then they relied on it in closing and in rebuttal. I just, I know I don't have much time left. I just wanted to say. You don't have any time left. Okay, okay. So no, look, we appreciate the arguments. I think we have, you've done a good job of representing your client. Thank you. Thank you to both counsel for your arguments in the case. The case is now submitted.
judges: NELSON, MILLER, DESAI